Our first case on the call of the docket today, Wednesday, March 16, 2011, is Agenda Number 6, Case Number 110166, Sheffler v. Commonwealth Edison Company. Counsel for the appellant, please proceed. Morning, Your Honors. Larry Drury on behalf of the appellant. This matter comes before the court after it being dismissed below on a 2615 motion to dismiss. The third amended complaint was dismissed by the trial court and leave to file a fourth amended complaint was denied. When the matter reached the First District Appellate Court, the First District spent a great deal of time on the question of a 2619 motion to dismiss, which was raised by the defendant in the case, but was never argued, never argued at all. The First District did say, of course, that anything that's a basis of a decision in the record could be considered by the court, and they went to great lengths to explain the question of where the jurisdiction is or where it is not. The First District basically said, you cannot be before the circuit court. You have to be before the Illinois Commerce Commission. The Illinois Commerce Commission has exclusive jurisdiction. The Second District Appellate Court differed in their opinion, kind of split the baby and said, well, for the question of damages, you can be before the circuit court, but for questions for refunds, reparations, or matters such as that, indeed, you should be in front of the Illinois Commerce Commission. When the case was remanded, a motion, excuse me, a motion for reconsider was filed in the Second District, which was denied. And when the case was remanded to the trial court, the trial court referred the case to the Illinois Commerce Commission for those issues which the court felt should be taken up and may have been within the jurisdiction of the Commerce Commission. That was appealed, and that was also denied. So on one hand, we have the First District. On that question, when it went to the Commerce Commission, when the Appellate Court ruled that it would go to the Commerce Commission and stay the action in the trial court, right? Yes. And was it always anticipated that it would go back to the trial court? Or was the stay to see whether the Commerce Commission could handle all the areas of inquiry or only to hear everything separate and apart from damages with the anticipation it would go back to the trial court? The First District, excuse me, the Second District opinion, and also the supplemental opinion by the Second District, indeed stated that they should refer the case, the trial court should refer the case to the Commerce Commission for those issues which were pointed out and delineated in the opinion, those issues which they felt should properly be before the Commerce Commission, but also they noted in their decision that after that review by the Commerce Commission, the other remaining matters, such as damages, would go back to the trial court and the circuit court of Lake County. So the issue isn't that difficult. One appellate district said you should be in the Commerce Commission. The Second District says you can be in both places. But what does the law say? The law, I think, is clear on the question. If you're asking for refunds, if you're asking for reparations, then you go to the Illinois Commerce Commission. If you're seeking damages, which we are seeking, then you go to the circuit court, in our case, the circuit court of Cook County. But both the Third Amendment complaint and the Fourth Amendment complaint, which we were not granted leave to file, is explicit in the allegations, and we are seeking damages due to the flooding of homes throughout the county on August 23, 2007. And we ask that the people be compensated for those damages. The trial court even went so far in the circuit court, Judge Novak, to say, well, you just have no reason, you can't go there, you must be before the Commerce Commission. Now, the statutes 2-501 is specific to 20 Illinois combined statute 5-201, that you can proceed for actual damages before the circuit court. You can get actual damages. It's clear, and it's unequivocal. And for whatever reason, the lower court said no, and at one point the lower court said it's ludicrous, you must be before the Commerce Commission. You could also get under 5-201 exemplary damages if it turns out that the actions of the defendant were willful. Another statutory provision which has been argued and is disputed, at least by the appellee, 220 Illinois combined statute 16-125E. That's a provision where if there's a continuous interruption affecting 30,000 people or more for four hours or more, whereby there's less than 50% of the standard voltage provided to the customers, subsection H states all remedies provided for under this section may be sought exclusively through the Illinois Commerce Commission per the act, and the utility may request a waiver. But subsection I, which the trial court and the first district appellate court glanced over, states provisions of this section, that's 16-125E, shall not diminish or replace other civil or administrative remedies available to a customer or a class of customers. Our case is filed as a putative class action. Obviously, we never got that far because it was dismissed on a 2615 motion to dismiss. The operative words in H are that they may have exclusive jurisdiction, may. So if a customer chooses not to proceed before the Illinois Commerce Commission, may says to me, may means may as the court's cases all say, that they can go ahead and file in the circuit court. It was these two sections, subsections H and I, that Judge Novak, the trial court judge in the circuit court of Cook County, said, that's ludicrous. It's poorly written, words to that effect, and it must mean that you have to go before the Commerce Commission to adjudicate your rights. Just stepping back for one moment, the village of Deerfields Cage, which is a second district case, also raised constitutional questions. And the question that they raised was and is, is that the circuit courts per the Illinois 1970 Constitution have general jurisdiction over all matters other than administrative matters as otherwise provided by law. And the legislature has not chosen to divest the circuit court of Cook County of its ability to hear cases for damages because the cases are clear that if they are going to divest the court of jurisdiction, they have to specifically say so. Mr. Jury, I know we're at the pleading stage, but give me an idea of what adjudicating liability would look like in this case if it was allowed to proceed in the circuit court. All right. If we were going to proceed in the circuit court, we would present evidence that would demonstrate that on or about August 23rd of 2007, there was a major storm. And as a result of that storm, there was considerable damages to people's homes. ComEd failed to respond. Failed to respond to that storm and basically did nothing and left people in a state where their property was damaged, perishable goods were damaged, and most unfortunately, as in the pleadings, the plaintiff, Sloan Young's son, who was on a life support system, did not get any response whatsoever from ComEd when the mother called in desperation, which would be part of the evidence we show, which goes to our claim about the registry and whether or not it should be given any priority, and said call back later. She couldn't get any help at all. So part of the proof that we show is that they provided nothing but substandard performance. And we have pled in a number of counts the basis of that substandard performance and what they failed to do. Is this a duty to provide uninterrupted service? Excuse me? Is this a duty that you're alleging to provide uninterrupted service? Well, per the statute, it says that if you have 30,000 people or more and there is an interruption for four or more hours and where the standard voltage is less than 50 percent, then you may proceed and you may get damages as a result of that. So the answer is yes. Is that correct for my question? Yes. Yes. We have alleged many duties in the amended complaint and also in the fourth amended complaint. Now, the fourth amended complaint, the trial court denied us leave. Before you get to that, I want to just keep with Justice Garmon's question on duty. I just want to understand it. With respect to this registry, are you alleging that and is it your position that ComEd owed a duty to everybody on the registry to restore power because of the medical nature, the medical problems related to those individuals? What I'm saying, Your Honor, is that having a life support registry to give aid to those who are ill in an emergency situation is basically a useless statute unless people in need are provided with the service that they need to get. Right now, the only record so far in the court is that when there is an emergency, they'll go to a hospital, police, fire, situations such as that. But the people such as Mrs. Sloan are registered, and they need to have some type of a priority list or a way of contacting these people because you will note in the pleading, Judge, that they are required under the registration, under the registry act, life support act, to red tag the meters of the persons who have filed in need of a life support system. So I had argued below when the court had asked a similar question, the police could know, ComEd could know, and if they get a phone call from a person who says, I have a son on a life support system, and he could die without the oxygen, get somebody there. Did they warn these people on the registry? Warn them as to what, Your Honor? Warn them that the power is out, you better take some precautions, and maybe you have to leave and go to an area where the power is, maybe you have to go to the hospital, whatever. Well, we didn't get to the point in this case whether or not they warned. Well, I'm just trying to understand what you think, you know, and the duty obviously is a matter of law, whether there is a duty or not. Are you taking the position that ComEd had a duty to provide as quickly as possible for people on the registry, that they had some type of duty to get the electricity running to those individuals? I'm trying to understand what the duty is. Well, the answer to your first question is I believe that they did not warn people when this happened, because that was evident when Sloan, my client, called, and they said call back some other time. Now, what should they have done? They should have made some type of a contact by phone, if there's a phone, a cell phone if they have a number, through the police, and let these people know that there's a serious situation going on, or provide an accommodation. Why do they have the list, Your Honors? What good is the list if they're going to leave a person who could die without electricity for his life support system sitting there and they say come back some other time? Now, the first district appellate court said it's a deplorable situation, you know, it's horrible, but gave us no relief. So it happened to the Sloans again in the month of August, as we've pledged in the third amended complaint, and again in the fourth, they left, not the fourth, just the third, I'm sorry, and they left the Sloans again with no parlor. Counselor? Yes. You said why have the list. Well, what was the purpose behind the legislation that required the list? Well, we noted in our brief some of the commentary from the legislators that were in there, but on that specific point, there wasn't a lot of legislative history to go on. As a matter of fact, the commentary had to do more so with the damages. I'm sorry. They need to provide some way under this legislation to go about contacting people. They need to have liability if they don't. I understand that, but what was, why was there legislation then, if the list is meaningless? Well, the purpose of this legislation would be to give people in need some type of a priority if there are life support systems such as the Sloan. These people, as opposed to somebody who is healthy and doesn't have a condition of well-being, need immediate attention, particularly under the circumstances that if you're without power and out of electricity, your life support systems won't function and you could die. It's very, very serious, and they need to do more about this situation other than getting somebody on the phone who says, well, call back later. And that's how they left it. The fourth amended complaint was denied. We were denied leave to file it. Under the Loyola Academy case, the criteria is would it cure the other complaints, is there prejudice, timeliness, and you had other opportunities to file amended complaints. In deciding this question to put in statutory interpretation, how do we factory in or do we factory in the value of the two forums and which one is better to decide, the commission or the courts? Is that a factor we should consider? Well, I think that the court needs to consider the two statutory provisions that I cited in the beginning of my argument in 5-201 and 16-125. And those two statutory provisions make it clear that for the purposes of damages and for one seeking damages, that the circuit courts of Cook County, Lake County, DuPage County, whatever county, have jurisdiction to provide a remedy for people who are seeking damages. Now, what the court can do, and I was thinking about this last night as a matter of fact, if the court would take the position of the second district where they sent part to the circuit court and part to the Commerce Commission, I would advocate that the circuit court, the circuit court should be the one to make the initial determination of what is staying in that court with respect to the question of damages rather than sending it to the Commerce Commission with instructions for them to pick out what they consider should be before the Commerce Commission by way of reparations or refund and then send it back. Are you familiar with the Illinois bell switching case? Yes, I am, Your Honor. How does that impact this case? Does it control? I don't believe so. And I don't believe so because the Illinois bell switching case, at least to the extent where they talk about the tariff having a limitation of liability in that case, is not an issue that's before the court. But the Illinois bell case also did mention that if there's a duty, a breach of duty and proximate cause, that you could have a claim for damages and for relief. So I don't think that the Illinois bell switching case is in any way detrimental to the claims of the plaintiff because it basically ‑‑ Except the appellate court found that it was. Correct? Except the appellate court, based on that case, found a limited liability or considered the idea of the limitation of liability based on the tariff. Correct? That's right, Your Honor, but the appellate court, I believe, was incorrect in saying that that tariff would be applicable to the situation in this case. First of all, it's not the same tariff that was in this case that the Illinois bell switching case had mentioned. But what about the tariff in this case? The appellate court here did discuss the specific tariff as to the limitation of liability based on responsibility for damages caused by the interruption of the supply of electricity. But that tariff goes on to say, Your Honor, but if ‑‑ but for if there's willful or negligence. So the tariff has an exclusion within itself for a willful act or a negligent act by the defendants. But you certainly have not played willful and want. You've not played a willful act, have you? We don't ‑‑ I don't believe we have a separate account for willful and want, but we certainly have an account with a multitude of allegations with respect to negligence, and the tariff carves out that aspect for negligence. So ‑‑ I see your light's on. Can I ask one more question? Sure. We probably got you a little far afield of where you wanted to go, and I suspect we're going to hear this from opposing counsel when he gets up in a second here. Could you just briefly address why you believe that the appellate court was wrong here with respect to your claim for money damages when they held, I believe, that it pertained to rates because the complaint concerned claims that ComEd provided inadequate and unreliable electrical services to plaintiffs? Because that is the part of your complaint. I mean, that's what we've been talking about, inadequate electrical services as far as plaintiffs are concerned. Why is that does not come under the umbrella of rates? Your Honor, this case does not come under the umbrella of rates because, one, we're not asking for a refund. Two, we're not asking for reparations. Three, what we're asking for is damages. We're not asking the court to monitor or supervise the adequacy or the level of services of Commonwealth Edison, but what we are asking is for relief by the way of damages for their substandard performance and breach of duties. Thank you. Thank you, Mr. Drury. Thank you. Mr. Hamill? Good morning. May it please the Court. I'm John Hamill on behalf of Commonwealth Edison Company. I want to make two main points, and in so doing, hopefully I'll address each of the questions that's been asked so far, and then, time permitting, there might be a couple of other issues we can get to. The first point that I want to get to is we recognize that the most likely reason the court took this petition for leave to appeal was because there are some differences between the First District and the Second District. There are differences. There's some tension in how they get to the main issues. But what I want to leave the court with is this. There is far more agreement between the districts on the key issues here than disagreement, and I'll explain what that means. Second point. Whatever way the court chooses to address those differences between the First and the Second Districts, the bottom line judgments here, in this case, of the courts below, should be an affirmance. Affirmed is the bottom line. And then some of the other issues we can certainly get to, though there is no real disagreement among the courts below on some of the other issues presented by the briefing. So that first point is that there's more agreement than disagreement among the courts below. Of the two, the First and Second District, our view is that the First District got it more right. And I choose the word more because there's stuff in the Second District decision that, frankly, makes sense about the proper role of the Illinois Commerce Commission. I think the First District got it more right because, to go to some of the questions that were asked, Justice Thomas' question, I do think that ultimately this case comes down to rates. The heart of both decisions, First and the Second District, is that the fundamental issues here, and, Justice Thomas, your questions went to what's the duty, what's the scope, what does it mean, how do you resolve liability. Those questions in both courts' approaches go to the Illinois Commerce Commission, where they rightly belong. The courts have some differences in how those issues get to the Commerce Commission, whether it's exclusive or I think actually the word is original jurisdiction that the First District used or primary jurisdiction that the Second District used. Either way, questions as to what is the duty, what is the statutory duty, what is the regulatory duty, what is the duty that ComEd goes, that gets decided by the Commerce Commission. And with great respect and admiration to the circuit courts, not by the 23 circuit courts across the state. ComEd's not the only utility in this state. There are 23 circuit courts, and if we were to say here that the circuit courts get to decide what constitutes the adequacy of a utility systems, we would have a very complicated regime. The place to start in seeing why the two districts were right and were more in agreement than disagreement is the request for relief in the third amended complaint here, which was the operative complaint by the time we got to the First District. And I'm going to read just a second here from the complaint. This is paragraph 69. It's in the First District's opinion. It's quoted at page 7 of the slip opinion. Here's what the request for relief was. Plaintiffs request an order in joining ComEd from its practice of refusing to have in place infrastructure and planning that by design, and there's a bunch more, could do a better job. Could stop interruptions of power. Could timely restore power. Could do all the things that the plaintiffs are saying were done wrong here. So it's a little bit creatively phrased, but it's a mandatory injunction asking the circuit court to stop ComEd from not having better systems in place. That is squarely the function of the Illinois Commerce Commission. And despite many, many requests below, there was never a better articulation from the plaintiffs of what they were alleging ComEd should have done. Now, we all know that under the Public Utilities Act, general supervision under section 4101 of the Public Utilities Act belongs at the Commerce Commission, not in the circuit courts. Mr. Hamel, Mr. Drury indicated, though, with respect to the ability to plead a Fourth Amendment complaint, that some of those, the injunctive relief, some of the things that you've already mentioned that were in the Third Amendment complaint would be out. Why, you know, maybe that's at a later point in your argument, but why should you not be allowed to plead the Fourth Amendment complaint, taking out some of those deficiencies that you've indicated? Sure. So there's two reasons why they shouldn't have been allowed to file that Fourth Amendment complaint. And one speaks generally to the damages question, and the other speaks to the particular statutory provision they were citing. But on the damages question, and the First District saw this quite clearly, and so did Judge Novak below, getting to the liability standard would require the identical questions at the circuit court that will be required for the injunction request. So let's put it this way. We put out in page 16 and 17 of our brief some questions that sometimes I think sound melodramatic, but they're real, and they're not rhetorical. And what those questions say is what should have been done differently on liability? We're not even getting to damages yet, the actual calculation of damages, but on liability, and we'd have to know liability before we could get to damages. What should ComEd have done? We have three or four, there's one family, three or four plaintiffs here from three different towns north of Chicago. One lives in Glenview, one lives in Des Plaines, one lives in Wilmette. Should the circuit court say, well, as to the plaintiff in Glenview, there should have been buried power lines, and maybe the one in Wilmette should have had a steel utility pole, or some better lightning-proof system, or better tracking systems, or whatever? And I know that sounds a little bit hyperbolic, but it's very real, because those are the questions to determine liability on a damages claim that the circuit court would have to answer. So there's really no distinction between the task. Now, as I understand, the proposed Fourth Amendment complaint was based only on 16-125, is that right? That is correct. And their position, Mr. Drury's position, I think, he can correct me if I'm wrong when he comes up again, that the statute expressly reserves civil remedies for a violation of that section of the act, right? That is incorrect. You are correct. That is his position. That is incorrect as to what the statute does. What 16-125 does is it sets up a special system for certain kinds of power outages. Now, let's just assume for certain types of power outages, really big ones, single ones. Now, Justice Thomas, I don't believe, and we've argued, that that provision applies here at all because of the type of outage that was alleged. But let's just assume, for argument's sake, that it did. What 16-125 says is if you've got this type of really big power outage, then you can get these types of damages, actual damages, if you bring a claim before the commission. And built into the statute is a waiver proceeding that the utility can file with the commission within 30 days. And the statute slightly changed over the course of this case on some of the procedural issues, but a waiver provision that the utility can file with the commission when a claim is filed. So the waiver gets granted under the very terms, the liability terms of the statute, if the damage was caused by weather, unpreventable damage due to weather conditions. So right away, as soon as a claim is brought under 16-125 at the commission, there's a proceeding, not only to adjudicate that claim, but also to determine the same kinds of questions we're talking about here. That's in the liability operative part of 16-125E and E-1. Then we travel down 16-125 a bit, and there's a provision there which says these remedies, the ones that Mr. Drury wants to invoke, may be sought exclusively at the commission. Now, Mr. Drury got up here and emphasized the word may. He said may be sought exclusively. That's not the way to read the statute. May modifies sought. It doesn't modify exclusively. It can't modify exclusively, otherwise there's no meaning to the word exclusively. The words are may be sought exclusively at the commission, meaning no one is telling the customer that he or she has to bring a claim, but if a claim is brought, it has to go to the commission. And again, let's just imagine the scenario where such a claim were attempted in court. The first thing that's going to happen is there's going to be a motion to get the case out of court and into the Commerce Commission because of the waiver claim. It's built in there top to bottom. What really I think Mr. Drury is arguing is that somehow the standards for the type of power outage that triggers 16-125 set up some kind of normative standard for what constitutes a really big outage. And he's saying somehow that provision can be bootstrapped into other provisions of the act, but it doesn't work that way. It's a specific, stand-alone, unique remedy. Again, it doesn't really apply here, but if it did, we'd be in the Commerce Commission. Mr. Hamill, the purpose of the registry, is that to forewarn, to notify these people on life support, for example? There is no specified purpose in the legislature, in the legislation. So I have no specific knowledge what the General Assembly was intended. Here's what they do. We put it in the tariff, ComEd's tariff, which gets filed and approved at the Commerce Commission. The tariff has a provision in it that says we're going to tag, which these days I think it's all done electronically, but we tag the meters of people on the registry. And that tagging gives ComEd the ability to reach out to those people when there is going to be a purposeful power outage, not something caused by weather or some other events, but where there's a purposeful power outage to warn those people as to what is going to happen. That's in the statute, in the tariff. I forget the exact words, but that's what it's there for. Now, it can't be. It's never been and can't be interpreted to somehow set some prioritization of restoration. And there is actually some evidence in this on the record. Even though we were on a 615, there were some TRO proceedings. And in the TRO proceedings, ComEd submitted some affidavits that pointed out that there are 4,900, at least at the time, approximately, people on this registry. And they're spread out throughout ComEd's territory, which covers all or part of three appellate districts. It's not like they're all in one place and ComEd could say, well, we'll turn on this person's power and that person's power and that person's power. It can't work like that. When you've got only so many resources to devote to restoration, you've got to prioritize. And the evidence here says we've got to go to hospitals, we've got to go to emergency institutions, water pumping stations, things like that first. We can't pick out people like that throughout the system. And this was a severe storm outage, right? It was. It was severe storms, I think, is the correct weather term, but yes. So even the internal policy with respect to the registry, ComEd's policy was not triggered in this case because that policy is only when ComEd decides to turn off the power, they'll notify people on the registry? That is correct. That's correct. There's no system to forewarn people that there's bad weather approaching. That's not part of it. And this kind of gets to the other question that you asked, Mr. Drury, which was, is this case really about rates? And ultimately, it is, and it has to be. And this is where, as between the first and the second districts, we submit that the first district got things more right. Because all the kinds of things that are being talked about in this case, which going back to the request for relief, is a broad request for truly the courts to step into the ICC's, the commission's, shoes. What the commission has to do, and it's this court's decision in Apple River that sets out the balance, is the commission has to establish a balance. Its very purpose is to maintain that balance between rates and services. They are flip sides of the same coin. When you get a case of this type seeking broad relief across the whole of ComEd's systems, that is a claim that ComEd should have been doing more or should be doing more with the rates that it is receiving. So when we look to the courts that have considered that question, balancing rates versus services, we find some clear recognition, not only from the first district, but from other courts as well, that those two things, rates and services, are two sides of the same coin. The most thoughtful expression outside of the first district's decision below and this court's pronouncement in Apple River really comes from some federal courts, which, and I'll say uncle to the second district, I know that those decisions are not binding on Illinois courts, but they're useful to look at. The Seventh Circuit and the Northern District of Illinois, in considering similar statutory structures, including the Public Utilities Act, said, look, when you are dealing with claims that services have gone out in the Bastion case, it was a claim that cellular phone systems weren't up to par. There weren't enough cells or towers or those sorts of things. The Seventh Circuit said that's a claim that the phone carrier is getting too much in its rates or it's not doing what is supposed to be done with the rates. And so you have to go to the agency to get relief. And the Public Utilities Act does, it does provide the plaintiffs with a remedy. No one is saying here that these plaintiffs are without a remedy. They're just in the wrong place. They could bring this claim. They haven't. I don't know why, but they could bring this claim, could have brought this claim at the Commerce Commission under the Public Utilities Act and gotten the Commerce Commission to hear their broad-based attack. And they do have a remedy at the Commerce Commission. Under Section 9252 of the Public Utilities Act, they can get, the word in the statute is damages, but yes, it is a form of rate reparations. It is monetary relief in which the claim would be we've been paying and not getting what we are supposed to be paying. That's where, again, we depart from the First and Second District on what's precisely the right way to go. Also, again, I don't want to criticize the Second District too much, because ultimately that court correctly recognized that things like adequacy of services, all the sorts of questions, my steel pole or buried power line examples, those kinds of things go before the Commerce Commission. See, I've got just a minute or two left here. The one thing I would say about the Second District's opinion on primary jurisdiction, even though I think there's much careful thought there, the problem with primary jurisdiction, at least as articulated by the Second District, is it doesn't leave, at least at one glance, enough of a command to the circuit court that you have to defer to what the Commerce Commission is doing here. Because the Commerce Commission has to look at not only Wilmette and Glenview and Des Plaines, but it has to look at Springfield and Champaign-Urbana and Peoria and Carbondale and so forth. So the Commerce Commission's views on these things are really important, and they're subject to court review, of course. This question of divesting the courts of jurisdiction, the courts get a say in all of this. The courts are there on review. That's a critical part of the function of administrative review. It comes straight from the Constitution that courts have administrative review powers. But that's the role, and that's where we differ between the two courts. I think Justice Garmon asked a question as to whether the switching station case was dispositive here, and I think it is in two respects. It says, as Your Honor asked, there is no rule of infallible service. And the key point about the tariff ruling in the switching station case from this court is the case recognized not only that there's no infallible service, but also that there is a regulatory regime established. Section 5201 is not all-encompassing. There's a regime established, and that regime here points us to the Commerce Commission. I think I've covered all the questions that were asked. If there's not, I'm happy to cover any more. Otherwise, we'll leave it at that. Thank you, Mr. Hamel. Thank you. Mr. Drury? Thank you. I noted in counsel's argument that he was very careful not to mention 16-125, subsection I. And indeed, that subsection, again, provides provisions of this section shall not diminish or replace other civil or administrative remedies available to a customer or class of customers. I also heard Mr. Hamel say that it would be too complicated if we went to the trial court first and then you have to go back to the commission. I don't think it would be too complicated for the circuit court to take jurisdiction and adjudicate the questions before with respect to damages and substandard performance. Counsel says, well, it's too complicated because of the question of a waiver. That's not complicated. And the court, as I said in my opening argument, could retain the jurisdiction, make its own determination of what it wants to do, and then if it feels that any of the matters should still go to the Congressional Commission, they can. And the only party that could ask for the waiver is not the customer, not the consumer. It's the utility. It's a one-way street. They're the only ones that can do it. So this question of waiver really doesn't add any substance to counsel's argument. The fourth amended complaint, as Justice Thomas was inquiring of, has specifically limited the nature of the relief sought to that under Section 16-125 period. No injunctive relief, no negligence, 16-125. Unfortunately, the trial court didn't consider that at all, and for the reasons set forth in the pleadings and brief, said that they would not do it. I was asked a question about the tariff by the court, and in looking back when I had a moment to sit down, that the tariff does not use the word willful. I misspoke. The tariff, I believe that Your Honor is referring to, it says brought for a default or negligence by Comet. If those circumstances are there and present, that that tariff would not be applicable. Another matter that wasn't touched on was that the court never adjudicated or spoke to the question of the Illinois Consumer Fraud Act, where we raised the question of unfairness and against public policy. That wasn't adjudicated at all. It was just left out. We've alleged that the acts of Con Ed were unscrupulous, and they were in violation of public policy, and they leave people to suffer, and that was not ruled on by the appellate court or the trial court. Mr. Drury, you had indicated, we talked about the life support registry earlier, and Mr. Hamill indicated that under the statute there was nothing in there to create a duty or a requirement or how it was to be used, and he explained how Con Ed did use it. To clarify for me, are you arguing that there is some kind of a duty that Con Ed has with regard to people who are on that life support registry? There is not an express statement in that statute that states that in circumstances such as Sloan that they would have to give their son a priority. The second question I have then with regard, he also indicated that it would be impossible to go into certain neighborhoods, pick out one place. How do you envision this working if Con Ed is supposed to do something with people on the life support registry prior to other users? First, Your Honor, implicit in that statute, the life support registry, is that they have to take care of the people that need the life support. It may not be in expressed words in that statute, but otherwise the statute is rendered useless. Now, I did hear Mr. Hamill say when they go ahead and they have a planned interruption or a rolling interruption on their own and they say we're going to do this, that's fine. But what about when you have an unexpected interruption, you have a life support registry, how are they supposed to contact them is your question. They've red-tagged their meters. If they've red-tagged their meters, they know who these people are, and they also have to send a letter to the Commerce Commission asking to be on that registry so they know who the people are and they know who the people are because it's Commonwealth Edison who asked how they are. Now, how they get to them and how they implement this life support system is their problem. They should take care of the good people that they're supposed to. That's what that registry is there for, not when they selectively decide to have an electrical interruption, that we need these people to come out when people are dying and they have a risk of dying. Otherwise, this statute is useless, and the way they are implementing it, and obviously by their commentary and their arguments in the briefs, they don't do anything about it. We just can't do it. Well, just can't do it doesn't cut it. Let them do it. Let them find a way. Let the court declare the rights under that statute of what people should expect from Commonwealth Edison. Mr. Drury, I don't want to make Mr. Hamill's argument for him because I'm not positive I understood it, but in terms of these questions about the registry, as I understand it, is whether or not that statute imposes a duty. The question that was asked of Mr. Hamill, and I believe his answer was it really doesn't set it out, but it only talks about planned interruptions. And I guess I want to know, in response to Justice Carmeier, are you agreeing or disagreeing that the statute does, in fact, talk about planned, known, advanced interruptions? There is some reference to planned interruptions. There is. I'm not certain as I stand here whether it's in the statute or a regulation as part of the implementation of that statute, but I do know that the statute, in fact, says that there shall be a registry. People who want to be on that registry notify Commonwealth Edison and they have to red tag their meters so that they know about it. And if we just leave it at that and they do nothing, as our briefs indicate, there's two people who died when their life support system went out. That's in the record. And ComEd did nothing. How many more people have to die before something happens? Mr. Drury, there is a difference, though, right? I mean, planned interruptions, they have control over planned interruptions, right? And even when you hear Mr. Hamill say we don't have a duty, what would the duty look like? Calling the people that have people in their household that are on life support to say there's a weather system coming in? I mean, don't some of these outages, you know, severe storms, you know, happen like this, right? I mean, so I'm trying to you're saying, hey, the courts can construct the duty, so help us out. What would it look like? They should contact them by phone. And when the storm strikes, rather than when it's coming, they should let them know it's coming, but when it strikes, they should have a restoration plan or a plan, which they do have, Your Honor. It's in our briefs. They have a restoration plan, which they haven't implemented, not so specifically with the registry. And that's the substandard performance. They should have a plan in place to effectuate that registry. And in conclusion, just a few more points, if I may. The Fourth Amendment complaint is usually generally liberally construed when leave to file a complaint is asked. And counsel pointed out Section 9-252. And it talks about Bastion, but Bastion relied on central telephone. Central telephone was the filed rate doctrine. It has nothing to do with this. But what counsel didn't say is that excessive and discriminatory rates are at the heart of 252. We're not complaining about excessive or discriminatory rates. What we want are damages. Commonwealth Edison needs to be held accountable for its actions. They need to be accountable and pay for the consequences of their actions. They cannot continue to run for shelter. As the amicus briefs indicate and as comment indicates and as the arguments indicate, let's seek shelter before the Commerce Commission. If that was the case, we didn't need these other statutory provisions that say that you can be before the circuit courts in Illinois. Thank you. Thank you, Mr. Drury, Mr. Hamel, for your arguments today. Case number 110166, Shuffler v. Commonwealth Edison. Agenda number six is taken under advisement.